John **MORRIS**, Applicant,

v.

John **SUTHERS**, Executive Director, Colorado Department of Corrections and the Attorney General of the State of Colorado, Respondents.

No. CIV.A. 97–M–2197.

United States District Court, D. Colorado.

April 17, 2001.

---

2. Having so concluded, the court need not address plaintiff's arguments regarding the doctrine of equivalents.

Howard A. Pincus, Assistant Federal Public Defender, Denver, CO, for applicant.

Clemmie P. Engle, Assistant Attorney General, Denver, CO, for respondents.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

John Morris ("Mr.Morris") is serving a sentence of life in prison on the uncorroborated statements of a 12 year old boy that he was fondled during the early morning hours of January 31, 1992. Because the trial court excluded the relevant testimony of a qualified expert witness under circumstances that impugned the integrity of defense counsel in the eyes of the jury and restricted the cross-examination of a key prosecution witness, Mr. Morris' application for writ of habeas corpus under 28 U.S.C. § 2254 is granted.

Bryan L. lived with his mother, Mary L.[1] She testified that Bryan came into her bedroom about 1:00 or 1:30 a.m., in the morning on January 31, 1992, crying and upset. When asked why, he said that John had choked his kitten. John Morris was a friend of the mother who frequently stayed at the house overnight, sleeping on a couch in the living room. The boy went

---

1. Consistent with the state practice, surnames of Bryan, his mother and sister-in-law are not used.

to school that morning. Bryan routinely stayed at school only half of the day because he had behavioral problems at school. Barbara G. who lived with Bryan's older brother in a common law marriage, met Bryan after school around 12:30 p.m. to go shopping for new shoes for him as previously planned. She testified that before they left her home, Bryan told her that John had touched his "private parts" and "butt" and then choked his cat by sticking his finger down its throat. When Barbara and Bryan picked up Mary to go shopping with them, Barbara told Mary that there was a problem. According to Mary, Bryan told her that John touched and kissed his butt. In her trial testimony, Mary said that she could not recall Bryan saying anything about his "private parts" or penis. Bryan, Barbara and Mary went ahead with their planned shopping trip.

Afterward, Barbara and Bryan dropped Mary back at her home and went to Barbara's house. Barbara went to the home of her next-door neighbor, Elizabeth Zorn and asked for her help. After hearing Bryan relate the incident, Elizabeth Zorn called the Aurora police dispatcher and reported that Bryan had been assaulted. Officer Howe responded to Elizabeth's home and spoke with Elizabeth, Barbara and Bryan collectively. Barbara told Officer Howe that Bryan had been sexually assaulted by a man who lived with Bryan's mother. Officer Howe took Bryan into the kitchen and interviewed him separately at 7:30 p.m.

According to Officer Howe, Bryan said he woke up to find John touching his private parts. Officer Howe related that

Bryan first said the man's hands were down his pants and then testified, "I talked to him a little bit and got more details, he said that his pants were actually pulled down." Vol. 10 at 82.[2] Officer Howe said that Bryan told him he saw John put his finger down the kitten's throat. When asked if John touched any of Bryan's friends, Bryan told Officer Howe that John touched the breasts of his friend Robin on three occasions.[3]

Officer Howe then went to Mary's apartment building. After speaking briefly with Mary outside, Officer Howe went into Mary's apartment, found John Morris lying on the couch and arrested him at 8:40 p.m., January 31, 1992.

Officer Howe completed an affidavit on a police form explaining that this warrantless arrest was based on his belief that John Morris was guilty of sexual assault on a child and cruelty to animals. Detective John Betz was assigned responsibility for the case against Mr. Morris. On February 4, 1992, before speaking with Bryan or any other witness, Detective Betz signed a verification on the information charging Mr. Morris with sexual assault. The information was filed in the district court on March 6, 1992. The verification was apparently based on Officer Howe's report.[4] Vol. 10 at 235. Detective Betz did not interview Bryan until February 18, 1992, some 18 days after the alleged assault. At trial, the detective testified that in that interview Bryan said that he was sleeping on the couch on his stomach in his living room and awoke with his pants down around mid-thigh and that Mr. Morris was rubbing his butt, that Mr. Morris then

---

2. Reference to the trial transcript is by volume and page numbers.

3. Robin testified that Mr. Morris had never touched her in an inappropriate manner.

4. Detective Betz testified that he also had a report from Officer Hall. Officer Hall testified that he had been dispatched with Officer Howe and that his role was to interview Robin.

reached underneath him and grasped his penis; that when there was a noise from the neighbor's apartment, Mr. Morris stopped the touching, pulled up Bryan's pants and then picked up a cat and choked it by sticking his finger down the cat's throat. According to the detective, Bryan also stated that he shifted and moved to indicate that he was waking up in an attempt to stop what was occurring, but that noise from the apartment next door caused Mr. Morris to stop the touching. *Id.* at 203, 206. Detective Betz did not interview Barbara G. until March 5, 1992, one day after the preliminary hearing on the charges against Mr. Morris.

Bryan testified about the details of the alleged assault at that preliminary hearing and at the first trial of Mr. Morris, ending in a mistrial after the jury reported that they could not agree on a unanimous verdict.

As jury selection began for the re-trial on October 4, 1993, defense counsel moved for a continuance on the ground that he had just been informed that his expert witness, Dr. Barbara Bebensee, had been injured in an accident. Dr. Bebensee was not a witness at the first trial.[5] Upon the court's inquiry about what Dr. Bebensee's testimony would be, defense counsel said that she would testify about the special requirements for an adequate investigation of children's complaints of sexual abuse and that "[S]he also is an expert in a recognized area of validation criteria that investigators, police officers, and attorneys should use in the analysis of these kinds of cases." Vol. 6 at 43. The court inquired whether Dr. Bebensee was going to suggest that the case was improperly investi-

gated, and defense counsel answered, "[T]hat's one aspect. [s]he has analyzed this case under the validation criteria that are commonly used in this field and she is going to be able to shed a great deal of light on this area for the jury. It's very relevant to what went on in this case and *it is critical to our defense.* *Id.* at 44 (emphasis added)."

The court granted the motion to continue, finding that Dr. Bebensee was an "important expert witness to the defense" who was unavailable and ordered Dr. Bebensee to file a report and provide it to the prosecution at least 30 days before the new trial date. *Id.* at 53–55.

The trial began on December 13, 1993. Given the result of the first trial and the statements of defense counsel about the critical importance of the testimony of Dr. Bebensee in support of the motion for continuance, it was apparent that conviction would depend upon whether the jury would find Bryan's trial testimony to be truthful beyond a reasonable doubt. It was apparent that Mr. Morris' prior convictions would make it unlikely that he could testify to deny the victim's allegations. Accordingly, the defense depended upon raising a reasonable doubt about Bryan's story, considering the variations in the many prior tellings of it as related by the witnesses. Added doubt arises from the failure of the police investigators to conduct an adequate investigation given the special circumstances of child sexual abuse complaints. Comments made by the court and the prosecutor throughout the trial showed their awareness of the critical importance of Dr. Bebensee's testimony to that defense.

---

5. Most of the trial record refers to Dr. Bebensee with an "s." Some of the transcripts refer to Dr. Bebenzee with a "z." Dr. Bebensee's report, prepared on her stationery has her name spelled with an "s." The transcript reflecting her testimony has her spelling her name with a "z." For consistency, her name is spelled with an "s" throughout this opinion, regardless of how it appears in the record.

During her opening statement, the prosecutor said, "[T]oday will be his [Bryan's] fifth time to testify. He has said the same thing about this sexual assault." Vol. 9 at 151. When defense counsel in his opening statement began to refer to Bryan's behavior at school, the prosecutor objected and at a bench conference said that she was not aware of a witness who would testify about Bryan's problems at school. Defense counsel replied: "[W]ell, Barbara Bebensee. One of the things in the field the expert looked at to determine the criteria for validating is they have to review all the school records and the behavior of the child at school, as well, Your Honor." *Id.* at 158–59. The court overruled the prosecutor's objection. *Id.* at 159. After summarizing all of Bryan's various statements about the alleged assault, defense counsel told the jury what they could expect to hear in the defense case, as follows:

We will be presenting some testimony in this trial. We will put on witnesses, although we need not do that, and one of the witnesses we are going to be presenting to you is a woman by the name of Dr. Barbara Bebensee. Now, Dr. Bebensee is a—she's not a medical doctor, she's a doctor of education. I think it's an Ed.D. is the way—instead of Ph. D., it's Ed.D. It's a doctor of education. She is also a licensed professional counselor.

She has a private practice, and what Barbara Bebensee does in her private practice is she treats youngsters and children who have been the victim of sexual abuse and sexual assault by adults. Also, part of her practice involves treating adults, and those adults that she counsels and works with are people who are now adults but as children were the victims of sexual abuse or sexual assault. That is her specialty in counseling and treating.

But it doesn't stop there. That's not all that Dr. Bebensee does. Dr. Bebensee is an expert in the field of investigations of these kinds of cases. She's an expert in the investigation of sexual assault on a child cases. She—I believe it's at UCD—she is on the faculty there. *She teaches classes in the proper investigative techniques that should be used to have a thorough, precise, and accurate investigation which will put forth an accurate picture of what happened.*

And it doesn't stop there. *She is also an expert in the proper techniques to be used when interviewing children who are alleged victim[s] of sexual assault or actual victims of sexual assault.* It is not a simple matter. It is a much more complex matter than it might appear, and she will testify as to that it is a very delicate process. *There are right and wrong ways of investigating these cases and there are right and wrong ways of interviewing children victims or witnesses in these kinds of cases,* and she will be shedding some light on that through her experience and her professional knowledge. She will shed light on those issues for you to help you understand this case. It might seem very simple on its face, but these are complex cases and she will be able to illuminate for you how complex they are and the proper way of investigation.

And she will also be telling you that children do make false accusations of sexual assault. They do make false accusations. It's not something that doesn't happen, it does happen. *And the experts in the field, they have certain investigative techniques that can assist them and aid them in discovering whether or not an allegation is false or whether or not it is valid.* And she will be discussing those things with you in her testimony.

Ultimately, she will be asked to give an opinion on how this case was investigated and whether or not this case points towards a valid accusation or a false allegation or accusation. And what I expect her to say is that—

*Id.* at 181–183 (emphasis added).

The prosecutor interrupted to object resulting in the following colloquy at the bench:

[PROSECUTOR]: I think the case law is pretty clear that testimony regarding truthfulness of the child and validity of the child's accusation is improper and I object to him telling the jury that that's what she's going to say when I don't think that she can say something that strongly. I'd be happy to get the case law.

THE COURT: No. understand the case law.

What are you about to say?

[DEFENSE COUNSEL]: Just that I expect her to give the opinion that she feels that this is not a valid claim.

THE COURT: Because of an investigative technique?

[DEFENSE COUNSEL]: Well, a whole lot more than that. She looks at many themes that I haven't gone into here on opening statement.

THE COURT: I'll permit it.

*Id.* at 184.

Bryan was the first witness to testify. He said that he fell asleep on the couch in the living room. He said that when he woke up, his pants and underwear were down to his knees and Mr. Morris was touching his butt and then his penis. Bryan told the jury that he pretended to wake up and that caused Mr. Morris to stop touching him Bryan also said that Mr. Morris pulled up Bryan's pants and then stuck his finger down a kitten's throat. Bryan testified that he then went to his mother's bedroom and told her first about the cat and then that John had touched him in places he should not have.

Defense counsel cross-examined Bryan at length, pointing out the differences and variations in what the witness said in prior testimony and in his out of court statements. On cross-examination, Bryan told the jury he woke up before his pants were pulled down, not afterward. He said he did not remember telling Officer Howe and Detective Betz that his pants were down when he woke up. *Id.* at 220–21. He did not recall his testimony from February, 1993, that his pants were down when he woke up. And to support his trial testimony that he was awake when his pants were pulled down, he added: "I recall waking up and—awhile before then, because I remember him [Mr. Morris] coming in the patio door." *Id.* at 220–21. Bryan did not recall previous testimony that the act of having his pants pulled down did not awaken him. *Id.* at 223–24.

Bryan expressed certainty that Mr. Morris' cheek touched his butt, and confusion when questioned about his previous statements that Mr. Morris touched his butt only with his hand. *Id.* at 230–32.

Defense counsel asked Bryan if he said anything during the assault and Bryan responded. "I tried moving and acting like I was going to wake up, but I don't remember saying anything." *Id.* at 233. When defense counsel asked him about earlier testimony from February, 1993, that he mumbled during the assault, Bryan said he did not remember saying that. But then he added:

[BRYAN]: How I was doing it was it wasn't mumbling, but I was murmuring like I'm going to wake up, groaning or— I don't know how I was going to say it.

\*    \*    \*    \*    \*    \*

I wasn't mumbling words, I was just—I don't know how you would say it—making sounds so he would think I was waking up.

*Id.* at 234. Bryan admitted telling Officer Howe he believed the assault stopped because a neighbor was making noise, and agreed that he never told Officer Howe about pretending to wake up. *Id.* at 265–66. Bryan's accounts of the alleged assault differed in other respects, including whether there was lighting in the living room, who disposed of the dead cat and how long the assault lasted.

During re-direct examination, the prosecuting attorney attempted to get Bryan to identify an exhibit, a picture of the boy found in the defendant's wallet. In response to the defense attorney's objection, the prosecutor said "[W]ell, the defendant had it in his wallet. I think it reflects—it will become relevant, think, through a number of witnesses, but hopefully through Dr. Bebensee." *Id.* at 277.

Before the trial resumed on the third day, December 15, 1993, defense counsel moved to exclude any testimony about the defendant's criminal history, fearing that the prosecutor would refer to it in cross-examination of Dr. Bebensee. The court declined to rule out all such questions in advance, advising the prosecutor "I will order that before you inquire about Dr. Bebensee's knowledge of the criminal history of Mr. Morris, you advise the court so I can then consider it in context with what we're dealing with." Vol. 10 at 7. The Court also said, "I don't know what Dr. Bebensee is going to say. I've not seen the report. But what I've heard about Dr. Bebensee raises some issues as to how far she is going to be able to go anyway." *Id.*

The defendant's challenge to the adequacy of the police investigation began with the cross-examination of John Howe, the first officer to speak with Bryan. Offi-

cer Howe testified about his experience and training for investigation of children's reports of sexual abuse. Vol. 10 at 106–125. Detective John Betz testified that he did not interview Bryan until February 18, 1992, 18 days after the defendant's arrest. *Id.* at 200. Detective Betz paraphrased what he remembered from that interview, which was not recorded in any manner. He also testified about what he had heard Bryan say in previous court appearances. The detective said on direct examination that he evaluated Bryan's statements and that they were substantially consistent. *Id.* at 211–12. When he began to elaborate, the court sustained defense counsel's objections. The detective was permitted to testify that he would not file a case if he had not evaluated it properly. *Id.* at 212. Yet, he had not interviewed Bryan or any other witnesses before signing the verification to the information on February 5, 1993, relying only on what Officer Howe had reported.

Defense counsel cross-examined Detective Betz at length. Despite his earlier objection to the prosecutor's asking for elaboration of the detective's opinion about the consistency of Bryan's statements, defense counsel asked "you testified here just a few moments ago that, in your opinion, everything you heard Bryan say was consistent with what he told you on February 18, 1992?" *Id.* at 217. The witness responded that all of the major facts were consistent but peripheral details did change. *Id.* The court then asked counsel to approach the bench, and commented as follows:

The problem I have with this line of questioning is as follows. When the prosecution endeavored to elicit from this witness whether the testimony of Bryan was consistent or not, you objected. I sustained the objection and he wasn't allowed to answer at all . . . . Well,

he was not allowed to give his opinion as to whether testimony was consistent or not. It was over your objection. . . .

*Id.* at 219–20.

Further along during the cross-examination, defense counsel asked about the detective's written report. Detective Betz admitted that he wrote the report in his own words and did not use the words of the boy, although he understood the importance of being precise. *Id.* at 228–29. Defense counsel explored with Detective Betz matters that Bryan did not describe in his initial interview but related later, including whether Bryan flipped over on his back during the course of the alleged assault and whether the defendant pulled Bryan's pants back up. *Id.* at 231–32. Upon inquiry about his training and experience, Detective Betz said that he was not sure whether there were guides to this type of investigation. *Id.* at 238. When asked whether he was in the possession of any books or literature on how to approach the investigation, the prosecutor objected and the court sustained the objection. A bench conference followed during which this colloquy occurred:

> [DEFENSE COUNSEL]: Your Honor, clearly, the manner of the investigation in this case and the kind of materials that this detective used as guides in investigating this case are relevant to this case, because the credibility of the police investigation is directly in issue in this case.
>
> THE COURT: The direction of the police investigation may very well be in evidence, though, I don't know what Dr. Bebensee is later going to say. *I'm assuming that she's going to come in and testify as to what her opinion is of the investigation* and even if the detective had a checklist on his desk it doesn't make any difference, no difference at all. The objection is sustained.

*Id.* at 239 (emphasis added). The cross-examination then continued as follows:

Q [DEFENSE COUNSEL]: Detective, did you rely on any guide when you were investigating this case?

[PROSECUTOR]: Same objection.

THE COURT: Sustained.

Q [DEFENSE COUNSEL]: Can you tell us from your training and experience what are some of the dangers and pitfalls that confront an investigator in a sexual assault on a child case?

[PROSECUTOR]: Relevance.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Your Honor, same record just made, would like to—

THE COURT: Okay. My ruling still stands.

[DEFENSE COUNSEL]: would like the objection on the record.

Q [DEFENSE COUNSEL]: Now, in your training, you are made aware of the fact that false accusations are made in these kinds of cases?

A [WITNESS]: That's correct.

Q [DEFENSE COUNSEL]: And are you also aware that recanting is not typical in these types of cases where false reports are made?

A [WITNESS]: Is not typical?

[PROSECUTOR]: Objection. There is no foundation that this witness knows anything about it. It's also not relevant.

THE COURT: Sustained on relevance.

[DEFENSE COUNSEL]: Your Honor, this officer has testified that he has specialized training in the field.

THE COURT: don't care. It's still not relevant. The objection is sustained.

Q [DEFENSE COUNSEL]: In your training, are you taught about what possible motives for false reporting should be—you should be on the lookout for?

[PROSECUTOR]: Relevance.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Excuse me, Your Honor, may we approach the bench?

THE COURT: You may, sir.

(The following proceedings were had at the bench, out of the hearing of the jury.)

[DEFENSE COUNSEL]: Your Honor, I'm just asking this Court to allow me to cross-examine this detective on his investigation and his training and skills. It was brought up by the district attorney. They opened the door to this. It is certainly relevant in this case, and how he conducted the investigation based on his knowledge is clearly relevant in this case.

THE COURT: No, what he did is relevant. What he didn't do or might have done is not relevant for you. *You can bring an expert in and the expert can be critical of what they did do. And the expert, assuming that one comes in, can say what they did fails to meet a standard. And I don't have any problem with that concept,* but to sit here and probe the area that you're doing through this witness, I sustain the objection.

[DEFENSE COUNSEL]: I understand. I'd just like the record to reflect that the law that this jury is to follow says they may consider the evidence or lack of evidence, and so, therefore, omissions, things that are not there are always relevant under the laws of Colorado and under the jury instructions. They are—specifically says that lack of evidence is something that the jury may consider and this Court thinks—I think just told me that what he didn't do or omissions are irrelevant.

THE COURT: I'm not going to respond to that, [defense counsel].

[DEFENSE COUNSEL]: just want the record to be clear.

*Id.* at 240–42 (emphasis added).

Defense counsel persisted in the same line of questioning. When he asked Detective Betz if the child could be motivated to make a false report because he was dysfunctional, the prosecutor's objection was sustained. *Id.* at 243–44. When the detective was asked whether the child might be motivated to make a false report because he wanted to leave home, the prosecutor's objection was sustained. *Id.* at 244. Defense counsel sought clarification at the bench, saying: "Judge, my understanding is this Court is not going to allow me to cross-examine this officer on what he did or didn't do in investigating this case." *Id.* The judge commented that he did not want to debate with defense counsel, and that he was sustaining the last objection.

Defense counsel persisted and asked the witness if he had investigated the possibility that the child might make a false report because he wanted to make changes in his home environment. The prosecutor objected and the objection was sustained. *Id.* at 245. Defense counsel finally asked the officer to just testify as to what he did, to which Detective Betz replied:

I interviewed the—I should say I—first I read the reports that I received when I was assigned this case. I then interviewed the victim and weighed his credibility, weighed what he had to say, and evaluated that through my experience in determining whether I believed his credibility and believed what he said to me and if it was plausible.

*Id.* at 245–46. Because he did not interview the victim before he signed the verification on the information charging Mr. Morris, Detective Betz' personal investiga-

tion could not have been a part of his evaluation of the case before it was filed.

Defense counsel asked Detective Betz whether he tried to determine if Bryan had any prior sexual experience. The prosecutor objected to the question and the objection was sustained. *Id.* at 247. Defense counsel then said the following to the court at the bench:

> Your Honor, first of all I want to say Mr. Morris has an absolute right to confront witnesses against him. This officer has testified on direct examination that his training and experience have taught him how to evaluate the credibility of cases—. . . How to evaluate the credibility of cases, and the Court seems not to be allowing me to question him as to those statements that were elicited on direct examination. These are all things that are relevant to the investigation of these kinds of cases. He's being held up as a quasi-police expert in investigating cases and I'm not being allowed to question him about any of these areas.

*Id.* at 247–48. The court responded that it was not going to engage in debate, that the witness was not qualified as an expert, and that he was sustaining the objection on relevance. Further, the court denied defense counsel's request to take a recess to review the direct examination. *Id.* at 248–49.

Defense counsel resumed his cross-examination, asking Detective Betz if he investigated whether there was any pornography in the home. The prosecutor's objection was sustained. *Id.* at 249. When asked, Detective Betz admitted that he did not talk to any of Bryan's babysitters or teachers and that he did not obtain any of Bryan's school records. *Id.* Defense counsel also elicited from Detective Betz that Bryan said nothing to him about an assault on Robin. *Id.* at 257.

The defense attorney asked Detective Betz why he did not tape record the interview with Bryan on February 18, 1992. Detective Betz said, "[T]hat's just not the way I've been trained to do that." *Id.* When the defense attorney asked the detective who trained him, the prosecuting attorney objected and the court sustained the objection.

On re-direct examination, the prosecuting attorney was permitted, over the objections of defense counsel, to ask Detective Betz to explain that he weighed the credibility of a victim or witness in determining whether or not to file a case, implying that he did so in this case. *Id.* at 272–73. He was also permitted to opine, once again that Bryan's testimony was consistent and accurate. *Id.* at 279–80.

On the following morning, before trial resumed, defense counsel advised that he would be calling Dr. Bebensee later on in the morning and needed twenty minutes to set up demonstrative exhibits. The court directed defense counsel to "show the demonstrative exhibits to the prosecuting attorney first to make sure there are no objections before they're set up in front of the jury." Vol. 16 at 4.

The defense called six witnesses, including Robin, who denied that Mr. Morris had ever touched her in an inappropriate manner. When Officer Hall was called to testify about his interview with Robin on January 31, 1992, the prosecutor objected. The court ruled that Robin's statements to Officer Hall, whether consistent or inconsistent, were inadmissible hearsay. The court explained:

> I don't think you're offering anything which is inconsistent and I won't allow consistent statements because her credibility has not been impeached.
>
> Setting that issue aside, we turn to this second issue and that is the scope of

the investigation by the prosecution. Now, I must say that I'm struggling with that point. *How far the police did or did not investigate, I really do not think is relevant until you get into some very tangential and remote questions of the weight to be given testimony.*

*Now these people have suggested they're going to bring in Bebensee to suggest to the jury, if I understand correctly, that the scope of the investigation was not adequate;* to that extent, whether or not the police interviewed Robyn or not, I suppose, is relevant. But to get into the contents of the interview then runs into the hearsay problems, which, I'm going to sustain the continuing objection by the people.

*Id.* at 106–07.

When Officer Hall was excused, defense counsel announced in open court that the next witness would be Dr. Bebensee. The court advised the jury that "the next witness who will testify is probably going to be using some demonstrative exhibits and it's going to take some time to organize the demonstrative thing here in the courtroom." *Id.* at 110. The court excused the jury and ordered defense counsel to show the demonstrative exhibits to the prosecution, cautioning that:

THE COURT: And, by the way, I'm a little shell-shocked on this one and paranoid because I've had some real bad experiences with so-called demonstrative exhibits before, not in this case and not by any of you people, but lawyers have said they deal with a demonstrative exhibit and they bring a tangible item into the courtroom and set it all up and show it to the jury.

6. Mr. Morris had two lawyers from the public defender's office representing him at trial. The hearing on the admissibility of these exhibits and the proposed testimony of Dr. Be-

So I want you to show these exhibits to [the prosecution] and if [the prosecution] has any objection to the use of these, because of their character and content, then we'll make a record and deal with them before we get the jury back up.

*Id.* at 111–12.

The prosecutor then asked the court: "Do we need to, at this point in time, deal with the question of, number one, the expert's ability to even testify in the case...?" *Id.* at 112. The court advised that "[W]hat I think I better do is let the proponent of the witness put the witness on the stand and ask the foundation questions. If you object to her testifying, then you can make the objection at that time [prosecutor]." *Id.* The court recessed for lunch.

After the recess, the court reconvened without the jury. The prosecutor said she had not completed reviewing all the proposed demonstrative exhibits, and commented

They seem to be, in essence, iterating and reiterating paraphrases of prior testimony of various witnesses at the various hearings and there are a number of conclusory statements and opinions within what I've seen and I—I don't think they're appropriate to recap—I don't think this case is supposed to be tried on a recap of prior testimony and it appears to be essentially recapping and paraphrasing—not even in requotes—a recapping of the testimony of prior witnesses together with side notes, I assume Dr. Bebensee prepared these.

Defense counsel[6] responded and engaged in the following discussion with the court:

bensee was conducted by the attorney who played a less active role in Mr. Morris' trial. The "lead attorney" became involved with the matter after the court ruled, in an effort to

[DEFENSE COUNSEL]: As far as the demonstrative evidence goes, a lot of what Dr. Bebensee is going to be testifying to is, first of all, the criteria that has to be followed when investigating these kinds of cases, what you look for, things along those kinds of lines, and we can get into that further when Dr. Bebensee is on the stand.

But a lot of what her testimony is going to be is applying that criteria to what was done in this particular case and this demonstrative evidence is going to be of utmost usefulness and aid to the jury in being able to keep all of this straight.

One of the things that they have to look at when they evaluate these kind of cases is what was said and when, and that's why the transparencies are set up that way, to show the jury—this was said then, this was said then, this was said then, and this is how it is inconsistent, and this is how it's inconsistent; and then Dr. Bebensee would be able to give her opinion on the stand.

THE COURT: Give her opinion?

[DEFENSE COUNSEL]: From the stand.

THE COURT: On what subject matter?

[DEFENSE COUNSEL]: On the subject matter that she's qualified by this Court to render an opinion.

THE COURT: What is that?

[DEFENSE COUNSEL]: In terms of validation criteria, in terms of the—how the investigation was conducted, whether it was conducted properly or not, whether the information that is provided through the investigation indicates a valid claim of sexual assault or not along with a lot of other things that are involved in her testimony.

And there are—I don't recall reading any conclu—conclusion-type statements in these particular transparencies. They're simply an illustration of the language that was used, when it was testified to, and what the reference is to it, where that information came from and that isn't anything any different than the district attorney would be able to do on closing argument by using the paper drawing—the paper board over there: This was said then, this was said then, and this was what was said then; and to show that it was all consistent. So I'm not exactly sure what [the prosecutor's] objection is at this particular point.

THE COURT: Well here's the problem from what I've heard through this trial and what I'm hearing right now. It appears to be, in significant part, that the expert is going to come in and do something other than merely describe in abstract what a proper investigation of a sexual assault on a child might be. It's clearly suggested in your comments that she is going to deal not in abstract but with the particulars of the statements of various people in this case and to render an opinion as to the quality or credibility of the statements, and that gets dangerously close to, if not becoming actually an impermissible statement by an expert as to what is true or what is not true in the facts of the case.

*Id.* at 116–18.

The prosecutor then suggested that rather than going through each of the charts, perhaps the court should consider whether it "is even going to allow the witness to testify,.. statement validity analysis has no general acceptance in the scientific community." *Id.* at 119. The court concluded that it would be appropriate for Dr. Bebensee to take the stand and

clarify and understand the ruling. That is     discussed further below.

go through "foundational interrogation" outside the presence of the jury.

Dr. Bebensee testified to her background, education and experience. She described the areas in which she had previously been qualified as an expert. Defense counsel asked Dr. Bebensee to explain what "validation criteria" means. Dr. Bebensee said:

The validation criteria, as are referenced to the literature, which, I have references with me today, there are certain things that are looked at in regards to the validation of—or, the credibility of the whole investigation.... [objection and ruling omitted]. One thing that's looked at is, number one, the disclosure; disclosure meaning who, when, where and how the child disclosed the alleged molestation. And then that is categorized into delayed disclosure, accidental disclosure, or purposeful disclosure.

We also look to what is called the category of storytelling, looking at the first telling, whether that was to an outcry witness or a police officer or social services versus subsequent tellings of what the child alleges to have happened.

Then we look at whether the telling of the story begins to look like it's been remembered versus programmed.

There are a different criteria that is looked at, remembered, has different sequencing to it and different details to it than if it's programmed. Also the number of sentences that a child uses to tell a story, to determine if it's remembered versus programmed. Also to look at if the child is telling in a child language or adult language. Also looking at if it is videotaped or if in the report there was any nonverbal language that was used while the child was telling what allegedly happened. Also looking at the suggestibility of the child during the interviews, if it was taped, if we would know that, or during any testimony.

Then we look at if the child has been exposed to multiple episodes of this abuse by the alleged offender and also if the child has had any recent sex—sexual training as far as the schools or from the parents or any exposure to television, pornography, videos, magazine, street talk, other children, et cetera.

Then we look at the progression of the act and if this act has grooming to it; in other words, did the offender groom the child so that the child was more approachable? If there was any enticements or gifts, if the child, by statements of other friends or family members, seemed to be a favored child where they got special attention from the alleged offender, how the offender engaged the child in the process. If the child was coerced or became cooperative and the difference between force versus molestation, how the offender approached the child.

Then we look at the next category, which is called secrecy, if there was any threats made by the offender, any indication that the alleged offender would convince the child to keep it a secret. If there is any money, gifts, other threats.

And then in looking at how the child reports a story, looking at the explicit detail of what happened and the explicit contacts of that so that if a detail is stated, if that detail continues or fades away, we also look at what is called the idiosyncratic detail that only the child or the offender would be privy to that would happen during the—before, during, or after the actual sexual molestation.

Then we look at if the child is recanting, and then we look at if there is any function—dysfunctionality in the family at the time that this is reported, if there

is a separation or a divorce going on or there is abuse in the family, other physical abuse, neglect, and so on, and then we examined the relationship that the child had to the offender.

Also within that framework there is an extensive detailed list of each of those categories and what needs to be looked at in each of those categories.

*Id.* at 136–40.

Dr. Bebensee referred to written law enforcement protocols and prosecution manuals on this subject and she testified that the validation criteria are standard in the field. *Id.* at 141. She explained.

[i]n the embryonic stage of working with child sexual abuse, in the literature it was first thought that children don't lie about being sexually molested.

As time has gone on and studies have been done, it is found that children can and do lie about being sexually molested and as a result of that the professionals in the field have developed criteria that is used to determine better if the child is credible or not credible.

*Id.* at 141–42.

The court advised defense counsel as follows:

I would be concerned that your—if you intend that she is going to evaluate the particular interest—or excuse me, the particular evidence in this case as compared to discussion of things in abstract and to then render opinions that the evidence is valid or not valid based on, of course, professional reasons and her knowledge, I'm—I would rather think from what I've heard so far that this lady would be very qualified to evaluate the evidence and to render opinions as to its validity, but I'm not real sure that that's admissible.

*Id.* at 142–43.

At the court's suggestion for an offer of proof, defense counsel stated:

I would be asking Dr. Bebensee what should be done in terms of the validation criteria, have her go into details about that, what should be looked at in these kinds of cases; and then I would be asking her everything that she looked at in this particular case.

*Id.* at 143. The court then asked defense counsel: "To what end?" Defense counsel stated

[DEFENSE COUNSEL]: To have testimony compared to what was—what was actually done in the case compared to what the criteria sets forth that should have been done. And just by way of pointing out that's just an overview and I can go ahead and continue to question Dr. Bebensee at this time.

THE COURT: Would you contemplate that she would render opinions as to the validity of the evidence?

[DEFENSE COUNSEL]: *She would be able to render an opinion as to how the investigation was conducted, whether it was conducted properly or not.*

She would be able to render an opinion as to whether the reports and statements made by the police personnel are inconsistent or consistent and whether or not significant details change. She can give an opinion regarding the analysis of the emotional, behavioral, and mental characteristics of the child, family background, previous reporting, and things along those lines.

She can given an opinion concerning corroborative statements and whether there was appropriate interview and investigative procedures that were used in this particular case, and we would be asking her to do that.

*Id.* at 143–44 (emphasis added). Defense counsel cited to the court several Colorado cases dealing with the admissibility of ex-

pert testimony in the area of child sexual assault, including *People v. Woertman,* 786 P.2d 443 (Colo.Ct.App.1989), *rev'd on other grounds,* 804 P.2d 188 (Colo.1991), *People v. Deninger,* 772 P.2d 674 (Colo.Ct.App. 1989), and *People v. Fasy,* 829 P.2d 1314 (Colo.1992). The prosecutor asked in what area Dr. Bebensee was going to be offered as an expert, to which defense counsel replied

> I would be asking to have her qualified as an expert in child psychology, child physical abuse, child sexual abuse, an expert in the validation criteria and detection of sexual abuse.

*Id.* at 149.

The prosecutor was then permitted to question Dr. Bebensee on *voir dire.* First, she moved to admit Exhibits B, C and D consisting of a copy of Dr. Bebensee's report sent to the district attorney's office dated November 13, 1993, and copies of the information contained on the transparencies that were to be used as demonstrative exhibits. *Id.* at 151. The prosecutor asked whether "statement validity assessment" was a scientifically accepted practice, without distinguishing it from "validation criteria." Dr. Bebensee attempted to draw a distinction, saying:

> I did not do it [validity assessment] on this case. The mental health profession now calls the new statement by statement analysis of either video or audio taping called validity assessment. That has only been out in the last three to four years. There is no hard research on that, therefore I did not use what you're referring to there to analyze this case.

*Id.* at 156. She explained statement validity assessment: "That's taking sentence by sentence, and they have a checklist, I'm familiar with it. did not use that in preparing for this case, did not." *Id.* at 160. She went on to explain:

[DR. BEBENSEE]: You—you are confusing the language in our field with the title of one of my charts, the validation criteria and credibility assessment. Those terminologies were used clear back in 1986 and they are still used today.

The new research—and, in fact, I even have—I better not say it. have a copy of the checklist you're talking about that goes sentence by sentence.

I don't—I did not do that. I did not do the analysis of sentence-by-sentence, so I did not do that. You're asking me if I've done it, and I keep saying, no, I did not do that.

*Id.* at 160–61. The prosecutor and Dr. Bebensee engaged in the following exchange

Q [PROSECUTOR]: So you're not going to testify, if allowed by this Court, to the way that this case was investigated and the interviewing that occurred with the child in this case? You're not going to testify about that?

A [DR. BEBENSEE]: *I'm going to testify to the appropriateness of the standards that have been established in the field of how to interview a child, that's what I'm going to testify to.*

I'm going to testify to the inconsistencies or consistencies of child statements in regard to the literature that talks about idiosyncratic detail and explicit detail over time that was part of the validation criteria that I read.

Q [PROSECUTOR]: So part of what you did was you analyzed how this child was interviewed; is that not accurate?

A [DR. BEBENSEE]: That's correct or—yes.

Q [PROSECUTOR]: And you're going to tell this jury that it wasn't done well and therefore the report is not valid?

A [DR. BEBENSEE]: *I'm not going to say that the report is not valid. I'm going to say that there are things that should have been done according to the standards in the field, even in the police field that should have been that were not done.*

Q [PROSECUTOR]: Would you agree that it is the—the way that it's accepted in the community that participates in analyzing interviewing of child witnesses, that the way to do that and the only valid way to do that is to look at a videotape of the interview?

A [DR. BEBENSEE]: No.

\* \* \* \* \* \*

Q [PROSECUTOR]: Do you disagree with this comment from—as you put it— the professional literature, which is from *Prospectives on Children's Testimony:* A videotape is the only means whereby the procedure and data obtained during the interview can be fully documented. Do you disagree with that?

A [DR. BEBENSEE]: Yes, because you are looking at the validity assessment. I did not do that.

Q [PROSECUTOR]: Dr. Bebensee, are you saying that you can get the procedures and data obtained in an interview some other way besides looking at a videotape?

A [DR. BEBENSEE]: Yes.

Q [PROSECUTOR]: Do you disagree with this comment: A typed transcript of the session is necessary for the systematic analysis of the content that is required to arrive at a conclusion regarding the validity of statements the child gives?

A [DR. BEBENSEE]: If you are using the validity assessment technique, which that article is referring to, then you must have audio or videotaping because that particular technique does not

have strong research to support it at this time.

I did not use that technique. I regret that they have called it the validity assessment. I regret that one of my charts says "Validity and Credibility Assessment" that has caused this confusion, but I do not know what else to say to clear it up.

*Id.* at 161–63 (emphases added).

When asked what she did do in this case, Dr. Bebensee said: "I did a forensic analysis of the documents that I was given according to the standards set in the field." *Id.* at 165.

The prosecutor then argued that Dr. Bebensee should not be allowed to testify because "[T]here's been nothing presented to this Court that this kind of analysis is a well recognized scientific principle which has gained general acceptance in the particular field in which it belongs," and that Dr. Bebensee should not be permitted to testify about Bryan's truthfulness. *Id.* at 170, 173–74.

In response, defense counsel argued for the admissibility of Dr. Bebensee's testimony:

We're not talking about a *Frye*-type situation, we're talking about rule 702, and what 702 says: Testimony by experts, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise. And that's what we're offering Dr. Bebensee to do at this particular time.

This is specialized knowledge. It's technical knowledge as well, and it—it isn't a situation where she can be excluded because it isn't—doesn't meet the

*Frye* test because it's not scientific enough or it's scientific evidence that hasn't been validated, or whatever, along those lines.

It has nothing to do with it. What we're talking about is technical or other specialized knowledge and she has indicated to this Court over and over again her expertise in this particular area.

She does have specialized knowledge based upon her knowledge her skill, her experience, her training and her education.

The district attorney puts quite a bit of emphasis on their exhibits of the two articles, I guess Exhibits E and F, that they have provided the Court....

Those articles, as was pointed out by Dr. Bebensee, have to do with the validity assessment which is not connected at all with this particular case in what Dr. Bebensee has done.

Her work has—has dealt with something entirely different, and that's why those articles do not apply.

In bringing those articles in to court and using them to explain why her work and her expertise is not appropriate is—is incorrect. There—it's like comparing apples and oranges together. It just doesn't flow. They are two separate things and Dr. Bebensee made a very strong point of trying to clarify that with the district attorney who refuses to hear there is a difference between these two things.

\* \* \* \* \* \*

And let me refer to that particular exhibit, which is Exhibit B, the copy of the [report] by Dr. Bebensee. There is a list there of every single thing that she looked at in this particular case in using the criteria and rendering her opinion.

\* \* \* \* \* \*

As far as the district attorney's argument having to do with this—that this case is dealing with the credibility of Brian L[. . .], that is incorrect. It's just simply incorrect. This entire case is dealing with the credibility of every witness that testifies in here, the police, the victims, the witnesses, everyone, the outcry witnesses. There is not a single jury instruction that says you only have to look at the credibility of the victim and whether you believe him or not as the basis of your decision in this particular case.

The credibility of the police officer and the other witnesses, they're—*the credibility of the police officer's investigation, that's all involved in this particular trial and it all has to be looked at by the jurors* when they decide one way or the other what they want to believe and what was done; and there are jury instructions that are given to the jury that say that specifically that you can believe all of what you hear, you can believe part of what you hear. You can believe none of what you hear if you would like to do that.

But the witness' credibility is to be taken into consideration and the credibility of the police reports is certainly an integral part, *and the credibility of the police investigation are certainly an integral part of this. We're not simply dealing with the credibility of victims in this case.*

And I might add that the Court limited the cross-examination of defense of the police officers in terms of what the police didn't do. *This Court limited getting into what they didn't follow through with, what they didn't do, and I am—I would assume that was in anticipation of the expert witness.* I'm not exactly sure, but this is an important aspect of a criminal trial and it cannot be just sloughed over.

*Dr. Bebensee is not going to testify that this is a thoughtful or untruthful account. She is going to testify to how to interview a child. She's going to testify to the inconsistencies and the consistencies, the reports of the testimony,* and that is all she's going to testify to.

It is appropriate to have her as an expert witness.

\*       \*       \*       \*       \*       \*

One other thing is that Dr. Bebensee would also be testifying to the quality of the police investigation in this particular case; and, once again, we are asking that the Court will qualify her as an expert, allow her testimony and overrule the district attorney's objection.

*Id.* at 176–83 (emphases added).

In concluding remarks, defense counsel also cited to the court, *People v. Hampton,* 746 P.2d 947 (Colo.1987), for the proposition that Rule 702 of the Colorado Rules of Evidence is more lenient than the *Frye* test. Vol. 16 at 183–84.

The court then issued its ruling. First it said the appropriate legal standard could be found in *Lanari v. People,* 827 P.2d 495 (Colo.1992), and described that case as holding that the pivotal question for the trial court concerning proferred testimony under Rule 702 is whether on the particular subject a jury can receive appreciable help from the expert. The court noted that the "test involves a common-sense inquiry, that is whether an untrained lay person would be qualified to determine a particular issue intelligently and to the best possible degree without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Id.* at 187–88.

The court began to show a misperception of the proposed testimony in the following comment:

The Colorado Court did adopt an observation by the Arizona Supreme Court in *Gaffney* and indicated when the only evidence consists of the victim's accusation and the defendant's denial, expert testimony on the question of who to believe is nothing more than advice to the jurors on how to decide the case, and stated that such testimony is not legitimized by Rule 704 and is not admissible under Rule 702.

And while I recognize that there are several other witnesses in this case, or have been so far, and I certainly don't know whether Mr. Morris intends to testify yet, this case really does get down to just exactly that: We have the accusation made by Brian L [. . .] and the denial of the accusation.

There certainly has been testimony that goes to the credibility of Brian, and I know that, and there certainly have been inconsistencies in Brian's story from time to time, and I know that; and we know what the police officers who have investigated have had to say.

*Id.* at 189–90.[7]

The court observed that Dr. Bebensee's report, Exhibit B, served as an offer of proof as required by *Lanari* and assessed the six statements of opinion in the report as follows:

Referring to Exhibit B, and of course considering also the verbal offer of proof made by [defense counsel], the proponent of the witness, it appears that the opinions that would be offered by Dr. Bebensee are listed as numbered one through six on the last portion of Exhib-

**7.** Bryan's name is occasionally spelled with an "i" rather than a "y" throughout the rec-   ord.

it B and the ruling on this motion merits a consideration of these particular defined opinions.

The first is that the initial and subsequent statements made by the child are inconsistent and significant details change. It would be my ruling that the trier of fact in this case, the jury, should be fully competent to recognize those observations without expert opinion directing them to these inconsistent statements or changes in detail. I don't see why scientific knowledge or specialized knowledge would be at all necessary to demonstrate that to the jury.

The second point that her report makes is that initial and subsequent statements made by family members and friends are inconsistent and significant details change. Again, I don't see at all why expert testimony is necessary to demonstrate this to lay persons on the jury. It doesn't take any particular scientific acumen or special skill or knowledge to understand and recognize these inconsistencies.

Her third point of opinion is that initial and subsequent reports and statements made by police personnel are inconsistent, and significant details change. And again I would say, just like with the first two points, I don't think that expert analysis or comment is necessary to allow a jury to understand and appreciate the importance and inferences of this type of evidence.

The fourth point changes subject matters dramatically. The fourth point states analysis of emotional behavioral and mental characteristics of the child family background, previous reportings, et cetera, relating to prealleged abuse and postalleged abuse pertinent to this case and timeline do not meet the necessary criteria established by the professional literature.

Now, I must say that this is somewhat puzzling if this lady, as it's been suggested, at least in part, is going to testify that the child has not suffered from post[-]traumatic stress syndrome. I just would be hard pressed to think and believe that that would be probative of anything. It might be true, but there is nothing to indicate that the lack of post[-]traumatic—or post[-]event emotional behavior or mental characteristics would necessarily mean that an event as simple as the touching or fondling that's been involved in this case did or did not occur. And again, I must say that don't think that that analysis would be useful to the jury in deciding the issues that are presented in this case.

Point five is stated that corroborative statements, reports, documents and miscellaneous findings do not support the child's statements. This sounds to me like an opinion by the expert witness that the child is not telling the truth and that type of opinion is not admissible under a long line of well established cases.

The last is that inappropriate interview and investigative procedures were used which brings into question the accuracy of the information gathered and the conclusions that were drawn from that information. I think that it would probably be permissible for Dr. Bebensee to testify on this subject matter in the abstract, that is to describe proper investigative procedures in a sexual assault case—I'm sorry. Strike that. I think I misstated what I wanted to say. Certainly what I just said was misleading and incorrect so let me try again with reference to point six.

The doctor would testify that inappropriate interview and investigative procedures were used, which brings into ques-

tion the accuracy of the information gathered.

I assume that in this area she would testify as to what procedures were used, what procedures should have been used, why the difference between the "should have been used" and the "was used" led to, in her opinion, conclusions lacking in validity. This of course draws into question whether or not any research that is scientific research has been accomplished or demonstrated which would indicate that one line of techniques would more frequently result in a valid determination than another.

In this area I would agree with [the prosecutor], without referring to Exhibit E and F—and I guess I ought to comment right now I'm not relying on Exhibit E and F in making my determination—that there has not been any demonstration that such conclusion would be scientific.

Her own publication and process, which is apparently involved in a process of peer review at this time, is admittedly, by her own statement, not based on controlled experiments.

I think the sum of this is that the proffered testimony really is not a matter for expert opinion. I think in very large part all it does is go to Brian's credibility. I don't think that expert testimony is necessary to evaluate Brian's credibility. It is certainly suspect. It's certainly an area of fair argument in this case.

There are lots of inconsistencies. There are lots of reasons why the jury might not think that his testimony was credible, but I don't think that it is at all appropriate or necessary for an expert witness to come in here and tell this jury what result they should reach. In other words, to tell the jury her conclusions that the information gathered is not credible.

There does not seem to be any scientific principles or there don't seem to be any scientific principles involved in this case that cannot be understood by the jury. And while Dr. Bebensee might be more qualified than the police officers who investigated this case in taking a fresh case and assimilating and interpreting the data available, I just don't see that her testimony would be assistive to the jury in the context of this particular case.

It would really get down to her opinion as to the credibility of the evidence where we have the accusation made by the victim and the denial by the defendant as to being the primary essence of this case, so I'm going to sustain the—or I'm going to grant the motion made by the prosecution to not allow the offered testimony of Dr. Bebensee in this matter.

*Id.* at 190–95

At the conclusion of the court's ruling, Mr. Morris' "lead" attorney (who had not made the offer or proof), asked the court for permission to make a record for clarification. He attempted to draw the court's attention to the inconsistency between the court's ruling excluding all testimony from Dr. Bebensee and the restrictions imposed on the cross-examination of Detective Betz:

> [DEFENSE COUNSEL]: Your Honor, I would like to make a brief record that I think is necessary at this time, if I might. First of all, Your Honor, when I was questioning the detective in this case as to the investigation he conducted or the lack of investigation he conducted, this Court repeatedly shut me down on that and ruled that that was irrelevant: what the detective did not do in this case or what his training was, how these

cases are to be investigated, what he was trained was the proper way to investigate these cases. I was not allowed to go into that area.[8]

He was held up this jury as having specialized training. Anytime went to go into that, this Court shut me down, told me it wasn't relevant and—

THE COURT: [Defense counsel], I'm sorry—and the record will reflect that I did have to raise my voice to interrupt [defense counsel] and it should be fairly noted that I did have to literally shout at him to interrupt him and get his attention.

I said before I'm not going to entertain further argument. I'm not going to entertain further argument. I've made my record. I know you disagree. I'm not going to change my ruling now, and that's it on this subject matter.

[DEFENSE COUNSEL]: Your Honor, just briefly, I just want to clarify the Court's finding on this case. I just want to make sure it's clear.

I notice that the Court went through the doctor's tendered report to the defense, prosecution and Court, and went point-by-point by six of her opinions, but I don't think that there has been a ruling on being able to testify as to—is this Court essentially saying that she cannot testify as to her opinion as to the way this investigation was handled, that the Court does not find that that would be helpful to this jury? Am I understanding that correctly?

THE COURT: I think so.

[DEFENSE COUNSEL]: And am I also understanding correctly that this Court is ruling that Dr. Bebensee can not assist this jury because it isn't spe-cialized—this jury doesn't need any specialized insight into what are proper investigative techniques to be used when—or proper interviewing techniques to be used when questioning a child victim or alleged victims of a sexual assault?

THE COURT: think that's a fair paraphrase of my order, [defense counsel].

[DEFENSE COUNSEL]: And also this Court is ruling that this—the Court does not feel that—and I think the Court has in one of the exhibits, the validation criteria used here—that this is such a simple matter that in these kinds of cases that her—the doctor testifying as to what the experts in the field looked at in these cases that she—that that would not be helpful for the jury to make up its own mind without the doctor offering an opinion as to whether or not it's valid or invalid because it's obviously our position that that will assist the jury in this particular case? Is my understanding correct there?

THE COURT: I think you're becoming argumentative. My—my ruling is as clear as it can get from being verbally made from the bench, as I said, [defense counsel]; and my ruling is that I'm not going to allow the witness to testify on the proffered scope of her testimony as given to the Court in this case.

[DEFENSE COUNSEL]: Okay. Your Honor, I—as I was just saying before, I do want the record to reflect that I was not allowed to question Detective Betz as to his training. I was not allowed to go in depth into that, and I was also not allowed to question the detective as to what procedures he follows in conducting investigations into this kind of case.

8. As previously quoted at pages 5, 6, 8, 12, 13, 17 of this opinion, the trial court assumed that the defendant's expert witness would testify about the investigation of child sexual abuse cases.

I was also not allowed to ask him what specific training he had into the interviewing of the child witnesses in this case and *in fact the Court, at the time it shut me down, made a comment that I assume that the doctor will be testifying to this, so I am sustaining the objection at this time.*

So we've been shut down in that area all the way around and I just want the record to reflect that.

THE COURT: Well, [defense counsel], look, it's very apparent that you're upset with my ruling and I don't find any fault in your being upset, but your demeanor is very clear that you're very frustrated and put out with my ruling. I'm sorry. I have a professional responsibility in this trial, just as you, and you know that, so you know I've got to make my call.

*Id.* at 195–200 (emphasis added).

After a ten minute recess, defense counsel added the following support for Dr. Bebensee's proffered testimony:

[DEFENSE COUNSEL]: Thank you, Your Honor. I just wanted to briefly supplement the record on—I do want the Court to be aware that we did endorse Dr. Barbara Bebensee on September 3rd, 1993, over 90 days ago, and I also want the Court to be aware that when we came over here this afternoon we had no notice that we were going to be having a hearing on the doctor's qualifications or abilities to testify in this lawsuit.

I do believe we neglected to object at the beginning of the hearing and we should have but we had no notice. This case has been going on for—well, with the expert endorsed—since September 3rd, 1993.

The district attorney had ample opportunity to notify us of their intent to challenge her credentials, also to challenge her ability to testify in this case.

And I will also note that on October 4th, I believe it was, when we went into trial, Dr. Bebensee took ill, this case was continued to this time so that she would be available to testify. And Mr. Morris, at that time, waived his right to speedy trial.

Up to that—at that time the district attorney had not made a challenge to the doctor's ability or need to testify under the rules of evidence in this lawsuit and should have a *Frye* hearing, or whatever you would call the hearing, a hearing on her ability or this Court's—whether or not this Court would allow the doctor to testify should have been held in the pretrial stages of this lawsuit and I would also note to the Court that in my opening statement I did tell the jurors in this case that they were going to be hearing from Dr. Bebensee and there was no indication at that time that there was going to be any challenge to her qualifications or to the admissibility of her specialized testimony in this area.

I am asking that there be some kind of instruction to the jury to indicate to them that this Court did determine during the trial that's what—maybe let them know also that that was what was taking so much time, to determine whether or not the Court felt that the doctor's testimony would be helpful to this jury in understanding the evidence in this case and that the Court determined that it felt the jurors would be competent to do it without the assistance of her expert testimony.

Because of the lateness of this motion, we've obviously been put in a very precarious situation where we've told the jury that they would be hearing from the doctor and now they're not going to be hearing from the doctor, and so it's

an ex post facto objection, I know that. It's after the fact that we had the hearing, but it should have been made up front.

I'm objecting at this time to having this determination made at this late date in the middle of trial after opening statements. I mean, this is something that should have been known quite some time ago, Your Honor.

THE COURT: Well, what I'm willing to say to the jury is that [the] Court has ruled that Dr. Bebensee cannot testify. I'm not willing to go further than that. They will have then an explanation that it was my ruling that precluded her from testifying.

*Id.* at 202–04.

The court called the jury into the courtroom, and explained that the delay was owing to the resolution of difficult legal issues:

I do think, as the results would have it, that the trial has actually been shortened by the activity that we worked on this afternoon.

I have ordered and ruled that a Dr. Bebensee, who was a witness that you heard described earlier on in the trial, will not be permitted to testify in this case and the reason I did deals with issues of law as compared to issues of fact.

Dr. Bebensee, having been disqualified from testifying by the Court—I don't know if that's the correct word. I shouldn't say disqualified—I just have ruled that she will not testify.

*Id.* at 208. The defense rested. There was no rebuttal case.

The following morning, the court and counsel met to discuss jury instructions. Defense counsel moved for a mistrial on the ground that Mr. Morris had been "denied his fundamental right to due process

of law, in that he has been denied a fair trial. He has been denied his right to present a defense. He has also been denied his federal and state constitutional rights to confront witnesses against him." Vol. 11 at 8. Counsel elaborated on each issue. Counsel also argued that the court's statement to the jury that Dr. Bebensee was "disqualified," adversely reflected on defense counsel's credibility particularly because in his opening statement he had told the jury that the expert was highly qualified. The court denied the motion.

A few hours into deliberations, the jurors asked two questions. The second question read: "If Bryan were to have recanted his testimony prior to the trial date, could he have been subjected to legal consequences?" *Id.* at 90. The court told the jury that "an answer cannot be given because the answer would involve matters of law not related to this particular case." *Id.* at 104. Defense counsel again moved for a mistrial, on the ground that the court's refusal to permit Dr. Bebensee to testify violated Mr. Morris' right to present a defense:

I think it's clear from this question that there is a fact in issue and that issue is the issue of Bryan L [ . . . ] recanting or not recanting. It's definitely an issue in this jury's mind.

We also anticipated it would be an issue and I want the record to reflect that Dr. Bebensee would have been testifying directly on point to this particular issue. In fact, what Dr. Bebensee, in her testimony, would have been explaining to this jury is what the literature in this field says, and that is the field of sexual assault on a child. Specifically on the issue of recanting, the literature says that in false claims or false accusations of sexual assault on a child made by a child victim—or alleged child vic-

tim, I should say—that recanting is extremely rare and that, in fact, it is much more common that victims recant in the cases where they actually were sexually assaulted. That is definitely what the literature says. I discussed this with Dr. Bebensee at length in my meetings with her.

We would have presented this evidence, and so I'm renewing my motion for a mistrial based on the Court's denial of our ability to present this kind of testimony to this jury, testimony that, based on Dr. Bebensee's scientific, technical, and specialized knowledge would have assisted the trier of fact to understand the evidence and to determine this particular fact, which obviously is an issue and always was an issue. So based on that, I renew my motion for a mistrial.

*Id.* at 105–06.

Jury deliberations continued into the following day. The guilty verdict was returned at 1:45 p.m. After the additional hearing and jury findings on prior convictions John Morris was adjudicated a habitual offender and sentenced to life imprisonment.[9]

On direct appeal, the Colorado Court of Appeals affirmed Mr. Morris' conviction and sentence. *People v. Morris,* No. 94CA0214 (Colo.App. July 25, 1996) (not selected for publication), *cert. denied,* No. 96SC699 (Colo. May 19, 1997). In that direct appeal, Mr. Morris claimed that Dr. Bebensee's testimony was wrongly excluded, and that this exclusion violated his fundamental right to present evidence under the due process and compulsory process clauses of the Constitution. He cited several Colorado cases in support of his contention that the trial court's ruling was

contrary to law and that Dr. Bebensee's testimony was relevant and admissible, including *People v. Gaffney,* 769 P.2d 1081 (Colo.1989), *People v. Fasy,* 829 P.2d 1314 (Colo.1992), *People v. Aldrich,* 849 P.2d 821 (Colo.Ct.App.1992), *cert. denied* (1993), *People v. Pronovost,* 773 P.2d 555 (Colo. 1989), and *People v. Banan,* No. 89CA937 (Colo.Ct.App., Dec. 15, 1994) (not selected for publication). The Court of Appeals held that the trial court did not abuse its discretion in determining that Dr. Bebensee's testimony would not be helpful to the jury and that the "essence of her testimony was an opinion on the victim's truthfulness as to specific statements made by him.." *People v. Morris,* No. 94CA214 at 3.

The Court of Appeals also rejected Mr. Morris' claim that his constitutional right to confrontation of witnesses was violated by the limitations placed on the cross-examination of Detective Betz. The appeals court rejected Mr. Morris' claim of error in the trial court's allowance of testimony by Detective Betz about the consistency of Bryan's statements, saying that: "a statement by an investigating officer that the testimony of the victim in court was generally consistent with reports the victim had made during his investigation, was not an attempt to elicit the officer's opinion as to the truthfulness of either the in-court testimony or the prior statement of the victim." *Id.* at 7 No authority was cited as support for that ruling. The appellate court did not explain why that testimony was not an inadmissible opinion and did not seem to see the inconsistency in admitting the detective's testimony and excluding the proffered testimony of Dr. Bebensee.

9. The prior convictions did not include any type of sexual assault or any crime against a

child victim.

The Court of Appeals rejected Mr. Morris' contention that the trial court erred in its response to the jury's question regarding recantation because, "there was no evidence presented to show that the victim had recanted or expressed an inclination to recant his testimony or that the issue of recantation was addressed at the trial or in the court's instructions to the jurors." *Id.* at 9. There was no comment about the rejection of Dr. Bebensee's proposed testimony on this subject.

The defendant's lawyers have not suggested what an appropriate additional instruction would have been and the court's response is not, in itself, such error as would support relief in this habeas proceeding. It is, however, significant to show the prejudice from the exclusion of all testimony from Dr. Bebensee, denying the jury the benefit of expert testimony about the special nature of a child's claim of sexual assault. Thus, it is true that there was no evidence about recantation but the reason is the compounding errors of the trial court in excluding that subject from the cross-examination of the officer who verified the charge against Mr. Morris and the refusal to give the jury the assistance of the testimony of Dr. Bebensee in making the credibility finding upon which conviction depended. The jury's question demonstrated the need for that assistance and adds to the doubt about the outcome of the trial.

Mr. Morris' application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 was timely filed on October 9, 1997, after the effective date of the Antiterrorism and Effective Death Penalty Act, "AEDPA." The AEDPA amendments set limitations on federal courts' review of state court convictions in what has been codified as 28 U.S.C. § 2254(d). That subsection reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Mr. Morris set forth ten grounds in his *pro se* application for the writ. His court appointed counsel filed a supplemental pleading amplifying three claims of constitutional error, the exclusion of Dr. Bebensee as a defense witness, the limitation on the cross-examination of Detective Betz and the state's application of a limitations bar which precluded Mr. Morris from challenging the prior convictions used to enhance his sentence.[10]

The Colorado Court of Appeals decision was based on an unreasonable determination of the facts in light of the evidence received and excluded at the trial. The court failed to recognize that the trial court's cumulative errors denied Mr. Morris' constitutional right to present a defense by generating sufficient skepticism about Bryan's testimony to create a reasonable doubt as to whether the assault occurred. The Court of Appeals repeated

---

10. Mr. Morris' present counsel noted in the beginning of the supplemental pleading: "That this pleading does not address all the claims in the petition is not a withdrawal of Mr. Morris' other claims. Nor is the failure to address the other claims in this pleading a comment on the merits of those claims."

the errors of the trial court in separating the questions of the proper scope of cross-examination of the detective who verified the charge from the relevance of opinion testimony about the adequacy of the investigation. Accordingly, this court is not required to defer to the decision of the Colorado Court of Appeals and must make an independent evaluation of the claims that John Morris was convicted after a trial that was fundamentally unfair because he was denied the opportunity to present a cogent defense.

■■■ Denial of the right to present a cogent defense violates the fundamental fairness guaranteed by the Due Process clause of section 1 of the Fourteenth Amendment to the United States Constitution. *See United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *Richmond v. Embry*, 122 F.3d 866 (10th Cir.1997).

The unusually lengthy quotations from the trial transcript are necessary to demonstrate how devastating the ruling excluding all testimony from Dr. Bebensee was and how it undermined the legitimacy of the effort to persuade the jury that the police had accepted the victim's statements at face value without conducting an adequate investigation to validate the filing of the charges.

The special nature of child sexual assault cases is recognized in the Colorado statute making out-of-court statements of a child victim describing the acts of sexual contact admissible if the trial court makes preliminary findings of reliability and the child either testifies at trial, or is unavailable as a witness. Colo.Rev.Stat. § 13–25–129. The admission of such testimony from four witnesses, including two police officers, and the fact that the victim witness had previously testified in court four times creates special circumstances to be considered in ruling on the defense challenges to credibility of the witnesses and the validity of the charge.

The trial court and the Colorado Court of Appeals unfairly characterized the proposed testimony of Dr. Bebensee as an opinion on credibility beyond the limitations of Rule 608 of the Colorado Rules of Evidence. Both courts incorrectly applied Rule 702, saying that "statement validity analysis" had no scientific support. Dr. Bebensee drew a distinction between the analysis of the validity of the victim's statements and the need for the use of generally accepted methods of investigation before deciding that the claim is sufficiently valid to warrant criminal prosecution. The criteria for analyzing a case referred to by Dr. Bebensee in her written report are almost entirely parallel with the "validation criteria" used by a psychotherapist testifying as an expert witness for the prosecution and approved by the Colorado Court of Appeals in *People v. Aldrich*, 849 P.2d 821, 827 (Colo.Ct.App.1992), *cert. denied*, March 22, 1993.

The proffer of Dr. Bebensee as an expert witness was less than clear. Counsel failed to articulate the critical distinction between opinions as to the credibility of the testimony given ·by witnesses and an assessment of the validity of the police investigation leading to the prosecution of the criminal case. The lack of clarity contributed to the trial court's error in refusing to receive any testimony from the defendant's expert witness. The prosecutor artfully added to the confusion in her *voir dire* questioning of Dr. Bebensee and by providing the court with two conflicting chapters of a book on the subject of child sexual assault cases.

The court failed to recognize that Rule 702 of the Colorado Rules of Evidence does not establish a separate category of witnesses. It simply makes admissible

opinions on relevant issues to assist the jury in understanding the significance of what they have seen and heard as evidence in the course of the trial. Contrary to the trial court's comments, the jurors should not be expected to have sufficient experience with circumstances comparable to those presented at this trial to enable them to rely solely on their developed knowledge of human nature to warrant the conclusion that their common sense gives them an adequate basis for their analysis of the evidence.

The prejudicial effect of the limitations on cross-examination and the exclusion of the defendant's expert witness was aggravated by the trial court's denial of defense objections to the direct and rebuttal questioning of Detective Betz. The jury was given this police officer's opinions that the investigation was properly conducted and that Bryan's accounts of what happened were substantially consistent in all material aspects while the defendant was prevented from attacking the reasonableness of both conclusions. Moreover, the jury was led to believe that the detective had special training and qualifications in the investigation of child sexual abuse claims.

These errors leave this court with grave doubt whether the jury would have convicted John Morris and because of that doubt, the writ should issue. *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

As another basis for the granting of a writ, Mr. Morris argues that he has been denied the right to challenge his prior convictions, used to enhance his present sentence, because of a state statute of limitations barring challenges to convictions more than three years old. Colo. Rev.Stat. § 16–5–402. Because the court has determined to grant the writ, it is not necessary to determine this additional issue.

Upon the foregoing, it is

ORDERED that Mr. Morris' application for a writ of habeas corpus is granted. Execution of the writ of habeas corpus is stayed for sixty (60) days from the date of this order to permit the state to provide Mr. Morris a new trial. If Mr. Morris is not provided a new trial within that time, Mr. Morris will be released and discharged from this conviction.